The first case this morning is number 07-1578, Sumitomo Mitsubishi against MEMC Electronics. Now, what I thought, what we thought we might do is to try and dispose of the jurisdictional issue which we spontaneously raised. First, at least to the extent that there might be something else besides, like we saw last weekend in that letter that you wrote us, and thank you very much, that was helpful indeed. We thought that perhaps the two of you might come to the podium, Mr. Rader and Mr. Evans, and let me invite my colleagues, if I may, or if there's anything else that you want to tell us. Do you agree with what Mr. Rader wrote us? I think the jurisdictional question, Your Honor, turns on the pooling agreement. The pooling agreement is out there as a background fact. It's an amended complaint. Judge Armstrong saw it as a background fact. She said she thought that Moore-Pennington protected the entire case, but she went on to consider the pooling agreement as a separate event. And under Christensen, if that's an independent basis for them to recover the antitrust claim, then it was equal with the private scoring jurisdiction. We don't. MEMC believes, looking at the amended complaint, that it is merely a background fact. It's not an independent basis in recovering the antitrust claim, and therefore the court does have jurisdiction. But that would be the only issue we saw. Okay. I invite my colleagues to fill in any gaps in their thinking. I'll have to. Can I wait until he comes up and asks me more about the pooling agreement, and deal with Mr. Rader separately? Would you prefer? Because I don't understand your pooling agreement argument at all. And rather than get into a big dialogue in the middle of his argument, I thought it might be better to wait. All right. So we'll proceed to the merits? No, I'd like to talk about jurisdiction with Mr. Rader. Well, in that case, I invite you to return to the council table, and we'll start with Mr. Rader. I didn't get your bottom line. Do you think we have jurisdiction, or we don't? I believe you have jurisdiction, so long as the allegations concerning the pooling agreement are not an independent basis for recovery under the antitrust claim. I don't even understand what you just said. What do you mean it's not an independent basis for recovery? You mean independent of patent law? The question before this court is whether there is a patent law issue before the court. I don't understand your argument about pooling agreement. Help me. Under Christensen, the Supreme Court case that laid out a lot of this, they talked about how there was an independent theory of recovery under the count that didn't involve a substantial question of patent law. Right. And if there is, there is no jurisdiction. There is no jurisdiction. All right. So let's move forward. The independent theory of recovery would be that if the pooling agreement in some manner raised an antitrust issue, I don't believe you need to resolve that question as a matter of a substantial question of patent law. Then what is the basis for our jurisdiction? What is the patent law issue before us? There's a patent law issue with respect to the antitrust, with respect to where they claim we've committed fraud of the patent office. That is a substantial question that's before you, but I believe that there is an independent theory of recovery under the pooling agreement that does not require... That would undercut that position. If it doesn't require a patent law, then it undercuts our jurisdiction. Right. In which case you come to the conclusion we don't have jurisdiction. Yes. If you reach the conclusion that the pooling agreement is an independent theory of recovery, then I don't believe you have jurisdiction. I don't believe the amended complaint sets it out as an independent theory of recovery. I don't think the trial court treated it as an independent theory of recovery, but if this court looks at the amended complaint and concludes that it is, then I think you lose jurisdiction. But then you're really saying you look at the counts of the complaint, and if there are counts of the complaint which don't arise under patent law, whether they arise under state law or anything else, those need to be severed and we don't have jurisdiction of anything? I think under Section 1631, the court would have to ask whether in the interest of justice, it should transfer to the Ninth Circuit or whether... Well, you don't transfer unless it's improper where it's brought. And then you look and see if it would have been proper elsewhere, right? I think under Christensen, though, it would be improper if brought here. In Christensen, there was no patent count. Christensen went back and forth three times, and it was determined that as far as the complaint was concerned, none of the counts of the complaint arose under the patent law. There was a defense to the license aspect, but none of them. Whereas here, we have the Walker Process, we have brought on the Patent Office, we have this long history, and, of course, we need to consider how much of the history carries forward. But that doesn't seem to fit with what you're saying about if, in fact, one of the counts of the complaint happens to be independent of patent law, the whole case goes elsewhere. Let me be clear. That would be helpful. MEMC is more than fine to have jurisdiction with this court to decide the case here. We're very happy with that outcome. Okay. Why don't you stop right there? Wonderful idea. Stop right there. Thank you. Mr. Rader, on the jurisdiction issue, you agree that Counts 2 through 5 do not provide jurisdiction for this appeal, I assume. Do you agree with that? It wasn't at all clear from your letter. Your letter made it sound like you think Counts 2 through 5 have some jurisdictional basis for us, but that's clearly not our law. Don't you agree? Well, certainly if the case falls within the scope of Christian Center Homes. We all know that, yes. We begin with that presumption. But Counts 2 through 5, the key to jurisdiction is your well-pleaded complaint. It's not what theories you later generate in your briefs, right? Correct. In your well-pleaded complaint, you had Counts 2 through 5, all of which alleged direct patent issues. They were, but your Honor, they're gone. Pardon? They're gone. They are gone. Counts 2 through 5 are gone. Well, they're not gone in the sense that the implications, the walk of process implications have not left. For jurisdictional purposes, they are gone. Do you not agree with that? I don't necessarily agree with that, Your Honor. Well, then you haven't read our cases. Our cases are very clear that Counts 2 through 5 are gone. Why? Because the trial judge dismissed them without prejudice, which under our law means that your complaint was, in effect, amended to remove those from the case, so that your entire jurisdictional basis has to lie in Claim 1, which is your antitrust claim. That's not where you are. I don't agree with that for the reason that we had the issue of enablement and infringement, which, of course, under the dismissal that you're referring to. Well, under what count? Look, you need a well-pleaded complaint that brings this case under patent law, either by a claim that invokes patent law or by one, as the Supreme Court pointed out in Christensen, that is a substantial issue and must be decided, a patent law issue must be decided in order to dispose of the case. Clearly, you don't have any claims in this case at this time that allege patent law as a direct cause of action. In the Count 1 allegations, there are included several allegations that talk about the Walker Process-type fraud, and they also talk about the lack of enablement and the sham litigation. Good. That's where I want to go. So that certainly provides a basis. We claim one is what you have to stand or fall on, in terms of our jurisdictional base. I will agree that that is what it would appear on the surface, and certainly I can't disagree that Counts 2 through 4 were dismissed without prejudice. You know, you made a rather eyesore snide comment in your letter, Mr. Rader, that I didn't particularly appreciate, which was at the end of your letter you said, and this Court did not even raise the issue until two business days before all argument. That's a snide comment, Mr. Rader, because it's not our job to establish your jurisdictional basis. It's your job, and you all never even raised what is a significant question of jurisdiction of this Court on appeal. I don't know how you missed it, but you all both missed it. It's your job to raise it. The fact that we had to spend two days trying to raise the issue ourselves and then get you to address it, it doesn't call for you to say, well, you guys didn't even raise it until two days before argument. I take some umbrage at that comment. And I apologize, Your Honor, it wasn't intended to be. Let's turn to Count 1. Let's turn to Count 1, paragraph 70 of your amended complaint. I really want to just try to find out whether we're here with proper jurisdiction under the law. Mr. Rader, I'm not trying to give you a bad time, but this is an issue that this Court must attend to. Look at paragraph 70. You with me? I am. That's the only paragraph that could possibly be applicable to our jurisdictional base, and that's one of your paragraphs in Count 1, because all the other paragraphs talk about monopolization in antitrust, but do not raise any patent issues. Count, the paragraph 70 says, MEMC has willfully engaged in a course of predatory and or exclusionary conduct in order to obtain a monopoly in the low-defect silicon wafer market in the United States. So far, you've said nothing that brings you to this Court. Then you say, including but not limited to enforcement of fraudulently procured patents or alternatively threats over prosecution of patent infringement actions against some to embed faith. Okay. There's your walk of process and your sham claim, right? And in addition, Your Honor, I'd also point out that in paragraph 68, we have incorporated by reference as allegations in this count, paragraphs 1 through 67. Yeah, that's fine. I'm glad you did that, but does that mean I've got to go back through all 67 paragraphs to figure out what it is you're alleging? I'm just pointing out that those earlier paragraphs do bring in the... Let's look at paragraph 70 one more time. What did you mean when you said, in a course of predatory and or exclusionary conduct, including but not limited to walk of process and sham? What did you have in mind when you said, but not limited to? What are your other theories for engaging in a course of predatory and exclusionary conduct that do not involve walk of process or sham? Do you have some other theories in that paragraph? No, there are no other theories, Your Honor, except that the wording, but not limited to, is really intended to be corollary to the Noble Pharma case and to point out that in an anti-competitive environment, there is not a specific requirement that there be the typical walk of process kind of fraud. It could be the sham litigation as well. Okay, you recognize that if you have some other theory in there, that undercuts your patent law claim. I understand. So that little phrase, including but not limited to, could be deadly if it includes some non-patent theories. And your answer is, oh, I didn't mean it to include some non-patent theories. No, we were trying to really bring the attention, as we did later in the later part of our complaint, where we specifically identified Noble Pharma. Okay. All right, that's helpful. Thank you. Can we move on? Do you have any questions on jurisdiction? No. All right, then let's start the clock on the substance of the appeal. May it please the Court. My name is Terry Rader, appearing for the appellants. This appeal, in essence, focuses on the fact that just about every ruling made by Judge Armstrong was related to her belief that we had to prove, through direct evidence, intent. And as this Court knows, that is not the requirement that even the Court has in connection with these principles. But this is a fraud count, not an inequitable conduct, and don't you have to show intent to establish a case of fraud? Certainly you have to show, certainly through circumstantial evidence. And as the Court said, Judge Shaw was a participant in the Starr Scientific case. There needs to be, and we'll use the language from that case, there has to be a focus on the evidence such that the single most reasonable inference able to be drawn from the evidence will meet the clear and convincing standard for the fraud or the intent. But wasn't that an inequitable conduct, not a fraud issue in Starr Scientific? It was an equitable conduct, but it also talked about the requirements for the walker process type of intent that was shown. You agree that there's a difference between fraud and the basis for a walker process claim and wrongful intent as a basis for an equitable conduct claim. But in either case, Your Honor, as the Court knows, the issue of intent does not have to be proven through direct evidence. It's very rare to have that type of evidence. No, but it might be the weight of any indirect evidence if, in fact, we're talking about fraud, actually fraudulent intent rather than negligence, gross negligence. Yes, and the precedent of the Court in using the Dippendots case, which is the case cited by MEMC as a background, there was no evidence at all presented of any sort of intent or circumstantial evidence or otherwise. Even in Starr Scientific, there was no evidence, and it wasn't a case on summary judgment either. I think the case that just came out of the Northern District of California that we've attached and provided the Court, the Sandisk case, provides an instructive analysis of this because that Court was very recently faced with the same issues that we had in front of Judge Armstrong, both the sham litigation component as well as the Walker fraud component. And in that case, the Court found one similar type of evidence, and I want to outline that evidence for you, the Court, one similar type of evidence that there was a factual issue that should go to the jury regarding intent. And specifically in our case, we can give the Court several examples. For example, the priority claim. These are misrepresentations that we've identified and we did identify to Judge Armstrong in the priority claim of April 1997. What do you mean by the priority claim? In the 302 patent, there was a priority to April 1997. You're referring to the earlier effective date. Correct. That's what you mean by priority. And in the 380 patent, there was a priority claim to April 1997. Is that relevant to the issues in this case? Why is the earlier effective date important? Was there some prior art that had to be gotten around? Right. And but for getting around this art with the priority claims that were made in both applications, both patents, they would not have gotten their patent. That was the evidence that we presented through declarations and supported them with evidence from the records of the Patent Office. And we provided that to the Court, and nevertheless, the Court doesn't even mention that evidence. For example, the Court doesn't even mention or analyze Dr. Wild's declaration, which went into the very detail of what I'm expressing. So in April of 19- Detail including citations to prior art? Correct. Okay. So in the case of the 302 patent, let's start with that. In the application, there was a claim to priority of April 1997. But in the case, the applicant filed in April of 1998 its final application and knew at the time it filed in April of 1998 that its earliest date of invention was September of 1997, several months after its claim of priority. It also knew about the Park prior art because it had engaged in a license agreement with Samsung in April of 1998. It also knew about the Voronkov, the significance of the Voronkov L band in September of 1997. Nevertheless, there was no change in its position when it submitted the Voronkov publication in December of 1998 after receiving a notice of allowance from the examiner and only three days before the formal notice of allowance went to the applicant. It never went through its priority claim. So this is an example of a false claim of priority to get around prior art. So to decide that question, we would then have to go back through the prosecution, decide whether in fact the substance of the intervening reference would have invalidated the patent even though the patent through all of the extensive proceedings has not been held invalid. Well, there were a lot of circumstantial evidence besides that, Your Honor. That's the reason it wasn't amenable to summary judgment, which is why we're here. But that's behind us. Those issues have been finally resolved. Have they not? The validity based on prior art, based on references, whatever they're available to, to the extent that they were or were not appealable in the past have been resolved. Have they not? No, not with respect to this issue that I'm referring to. The prior art that was gotten around was never used as prior art because of the priority claim. And in the 380 application, the same thing happened. There was a point where both the Vronkoff publication and a different patent or publication of 4I were sworn behind using the claim of priority. And even at that point, this is now in the year 2000, so clearly MEMC knew that there was no basis upon which they could make that claim of priority in either of those patents. And in both cases, that prior art that I just referred to, the Vronkoff publication and the 4I publication, this has never been adjudicated previously. These were references that the Patent Office considered material and clearly would not have allowed either one of these patents but for these claims of priority. And this is just one example of the substantial amount of evidence which would lead the court to the statement that was made by Judge Michel in the Starr Scientific case that the single most reasonable inference would be that this is clear and convincing evidence of intent to commit fraud on the Patent Office. I don't think fraud... I still thought the issues in that Starr case were inequitable conduct. The case was related to inequitable conduct, but it certainly is also instructive on the issue of the intent that we're talking about. With respect to enablement... Before you leave that, you do agree with Judge Newman that while in inequitable conduct we go through sort of a balancing process, intent versus etc., we don't do that under Walker process, right? They each have to be independently ascertained, each element. I understand, and that's the reason when we presented the evidence we presented to Judge Armstrong. We understand that there's still the element she found almost without exception that there was no direct evidence of intent to commit fraud. She wasn't saying, and most of her findings don't suggest that there isn't a misrepresentation regarding priority, a misrepresentation about other evidence, enablement, and things of that type. She's not saying that. She's saying that we didn't show direct evidence of intent, and that's just not correct under the law as the Sand Desk case issued in October, two weeks ago, so found. And that case is very instructive, I believe, on this issue of why this case was not amenable to summary judgment with the overwhelming evidence we had. On the issue of enablement, first the argument made in the 302 patent about the Takano patent, the prior patent, was clearly a misrepresentation. It was a misrepresentation at the time it was made, and it was the reason the examiner went ahead and allowed the patent. The MEMC argued that you could not reach this 1,000 defects per cubic centimeter limit using the slow cooling technique in the Takano reference. And it also argued you wouldn't have a substantially vacancy-dominant area. After that, the examiner allowed the case. And so we know that the MEMC has never, it's a law of the case, MEMC never has an actual reduction. They never actually reduce to practice what they claim. And, in fact, there's no evidence that there was ever any knowledge or belief on MEMC's part that they could do that. There's nothing in the record, and the record shows that MEMC, to the contrary, didn't have any evidence of a reduction to practice or that its patent would work at the time it made this misrepresentation about Takano to the patent office in the 302 application. Other examples of issues that relate to this, which is part of the reason that we submit that this was not amenable to summary judgment, is that whenever the applications for the 302 and the 380 were filed, there was also another application that was filed. MEMC claims that its claim for, in the 380, was directed to interstitial. Well, that's not what the claim says. The court can see for itself that the claim is broader. And, in fact, there were three applications filed. One of them is entitled vacancy-dominant silicon. That's the 302 patent. Another one, which is not in this case, the 672 patent, says interstitial-dominant material. And then, finally, the 380 broadly is entitled low-defect, just generically low-defect. And so, at the time they made the false claim of priority relating to the April 1997 date, when they knew at that point they weren't entitled to it, this was a very important part of why the patent office went ahead and allowed those claims. We have, in the case of the testimony that was presented in the summary judgment, we have testimony by Dr. Park that MEMC could not even make any samples that would work. There was also acknowledgments by the president of MEMC in the agreement with Samsung that they had to have Park's technology in order to enable, the word enable, them to make the wafers that Samsung required. And so they knew about the Park application. They also knew that they had to have that, that their own patent application, but they knew that in April of 1998 when they filed the 302 patent application and these other patent applications that have issued in pads, as all part of the family that they were ultimately able to get. And the one thing that's always been the case here in the evidence is the fact that there's always an inconsistency between the positions that MEMC took in the patent office and its positions in the litigation, and we pointed that out. And these are also very relevant facts that the court should take into account. I think that the demonstration through overwhelming evidence that was provided to Judge Armstrong was not treated with the kind of analysis that it should have been. This court has already found that when there are declarations submitted, that that can create an issue of fact on these issues in this area. And Judge Armstrong failed to even address all of the facts that were laid out in both the declarations of Dr. Wilds in particular and Mr. Isbester relating to the things that relate to intent. So I think I'm going to reserve some time. We'll save your rebuttal time, Mr. Rader. Thank you. Okay. Now, Mr. Evans, let's see if there are any remaining issues. Just to tidy up the jurisdictional question, Mr. Evans, I was unclear as to where you stand. The pooling claim doesn't require resolving a question of patent law. It requires resolving a question of antitrust monopolization law. That is, does pooling of patents create a monopolization problem? We don't need to get into what the patents are or even whether they're valid. All we need to ask is whether the pooling is a monopolization problem on those facts. So that doesn't get us where we need to go. Do you agree now with the position of Mr. Rader that he has sufficiently alleged Walker Process and Sham issues under Paragraph 70 of Count I, that that issue is necessary to decide patent law issues to resolve it? I agree that those allegations raise substantial questions on the patent laws consistent with this Court's jurisdiction, yes. That's your position? Yes. Thank you. Any questions? Would you restart the clock, Ms. Whiting? We'll turn to the substance. Thank you. Just one last closer on jurisdiction. If the Court decides it does not have jurisdiction under 1631, it has to take a peek, as some of the lines of the Court say, or look at the case before it just summarily transfers it to California because if it concludes that this was a mistake that shouldn't have been made or if this was a situation where the claim lacks merit, the Court can simply dismiss the case in lieu of transfer. Cases on that point include Phillips v. Sider, 173, Fed 30, 609, and 610 to 611, or 614 is where I'm looking, Galloway Farms v. U.S., 834, Fed 2nd, 998, 1000 to 1001, and Nichols v. Searle, 991, Fed 2nd, 1195, or 1201. I think perhaps if you think we need those citations, perhaps you can write us a very short letter to take them. That would be your preferred disposition, but you would prefer we decide the case. I would prefer you decide the case, yes. Okay. Okay, so there are four basic issues on the table. Is the patent valid over the prior order? Does it meet 112's requirements? Do we have evidence of infringement? And that's it. With respect to the prior art under California Northern District rules, they put up their preliminary and then final infringement contentions. It was 50 or 60 references. We moved the Court to make them specify where the problems were, where they believed they were. They narrowed it to 14 patents in prior art references, and then Judge Armstrong entered summary judgment that the patent was valid over all of that art. We submit that if this case was a sham or if it had Walker process problems, we never would have gotten that summary judgment. Secondly, with respect to enablement, this Court on the last appeal saw extensive briefing on both sides on the enablement question and determined it was a question of fact as to whether or not the patent was enabled. Questions of fact for the jury are not sham litigation and they're not Walker process problems. Was the patent infringed on inducement? This Court in the first appeal concluded that was a question of fact. With respect to Daubert, the Daubert issue is what had our infringement evidence excluded. This Court found that although the issue is a close one, under our deferential standard of review, we cannot say the trial court abused its discretion. Those questions are not shams. They're not Walker process violations either. Was the pre-filing investigation adequate? We had declarations from Dwayne Mathewitz of the Howery firm and Ed Halick, formerly of my firm, that went into great detail on the pre-filing investigation. This Court found that the attorneys performed a good faith informed comparison of the claims of the 302 patent against the accused waivers. Good faith informed comparisons are not shams and they're not Walker process violations. If the pooling agreement is still in the case for some reason, they presented no evidence that the pooling agreement was any kind of a violation. They just said we had a pooling agreement. As the Court knows under the Department of Justice guidelines, pooling agreements are oftentimes pro-competition. The specific issues. First and foremost, we presented substantial evidence that the slow pool process in fact works. With Takano, Takano said slow is less than 190 minutes. Slow in the context of our patent was 5 hours to 60 hours. Takano stopped at slow pooling. Our patent went beyond that. It said you have to control the pool rate, which is what drives the interstitial count. You also have to control the thermal gradient. Takano said nothing about either one of those. It's clear that both of these patents are extremely valid over Takano. There's no issue of validity there. And that's what the trial court was looking at. The trial court was saying they don't meet the bar for what they need to prove. If you look at the 302 patent, column 18, lines 57 to 63, it asserts that figure 16 included a core of the relevant vacancy-dominant agglomerate-free material. And that occurred at 125 millimeters to 170 millimeters, as well as at 290 to 400 millimeters. If you look at their expert's declaration, Ms. Idenson, she agreed that figure 16 showed a core of that material. She agreed that A4981, paragraph 5, lines 9 to 10. So she agreed we had a reduction of practice shown in our 302 patent. If we turn to figure 23 of the patent, column 22, lines 60 to 64, explains how it shows center-to-edge vacancy-dominant agglomerate-free silicon on the range from 665 millimeters to 730 millimeters. If you look at their expert, Dr. Wiles, he provided a declaration at A4993, paragraph 10, lines 18 to 28, where he grudgingly agrees that that area was center-to-edge vacancy-dominant agglomerate-free silicon. Again, that's another reduction to practice shown right in the figures of the patent. Apart from that, we had declarations from Dr. Mostogno, who went through all of the reduction to practice evidence. He found micrographs, he found test data, he found emails. It's all in the record. It showed, again, a reduction to practice. The slow cooling process works. There's certainly no sham. There's certainly no fraud. For some reason, we don't think it works, and we're doing this. We're just kind of making it up the last six or seven years. But isn't there an underlying question, Mr. Evans, about how clear or soundly based in science your invention is? And isn't that a question of debatable fact? You're saying it's not. Well, their experts, as well as the patents, show a reduction to practice of what is claimed in the figures of the patent. And so while they may argue with the science, I don't think you can say that it's a sham to bring that lawsuit. I don't think you can say that it's a Walker process violation to bring that lawsuit. And that's really the ultimate question. Well, if the scientific basis for your invention is bad science, doesn't that undercut your position? And if you knew it, assuming you knew it was bad science. Bad science in which respect? In the respect that they're arguing it was bad science. I don't know all the science that underlies it, but they presented evidence on that. On one side of that, you presented evidence on the other. Isn't that a jury question? I don't believe so in this case, Your Honor, because I'm not saying it wouldn't be in every circumstance possible, but in this case where you have the patent showing the material and you have their experts looking at that material and agreeing, and where that material fully enables the claims that were asserted in this case, the alternative question would be, well, how about your test evidence? Was that bad science? And on that, this court ruled that it was a closed question. Under the standard of review, it wasn't going to reverse. If you look further on that science question, that Daubert question, the 1e to the minus 3 standard is a standard they call out in two of their patents that issued after our patent. They identify the same standard. They identify the same method of etching down through a volume, measuring the volume by the surface area observed, and then determining the detection limit as a function of it. They told this court that that was bad science, and it's in their own patents. And I guess I take a little umbrage of that against them as well. The issue before us is not whether it was good or bad science. The issue before us is whether the trial judge was correct in giving a summary judgment on that question, i.e., no reasonable jury considering it, right? I don't think that a jury has to have a material question of fact in front of it. And when this court, as well as a trial court, both concluded that it was a good pre-filing investigation, the science was strong enough for the pre-filing investigation, and when this court concluded it was a close question to exclude the evidence, whereas if the evidence had come in, we're off to trial. I don't think when the question is that close, when it's studied that hard by as many courts and as many people, as many resources were put into it, I don't think if it was truly a sham or truly a walk-of-process problem, we would be here. On the priority claim on the 380 patent, if you compare the provisional application that was originally filed in 1997, and you compare it against the claims that actually issued in the 380 patent, you'll find that most of the claims are identical. You'll further find that to the extent the language was modified, in Claim 1, for example, it was simply modified to add a diameter limitation. The language about being substantially free of agglomerated intrinsic point defects was in the original 1997 provisional application, it was in the utility application as filed, and it would be a very weird situation where someone committed fraud because they claimed priority back to identical claims with the same specification in a provisional application. So all the talk about priority dates we don't think has any merit. With respect to the 302 patent under the Purdue case, no patent had issued yet, and so to preserve the filing date as prior under the Purdue case, you're entitled to relate it back to a specification that has a lot of common figures and words, even if the claims aren't necessarily supported by that earlier specification. The case law says that that is not fraud, and again, we're looking here for issues of fraud. That doesn't support a fraud allegation. With respect to Voronkov, as the trial court noted, he was our employee. Any of his inventions had to be assigned to MEMC. MEMC had no basis to keep him off of a patent. They could have put him on the patent at no additional cost, expense, or anything else. So the fact that he testified in his deposition, I don't think I'm an inventor of this. That's what he said. And he didn't appear to be an inventor, even though he did have early non-published papers. We think that sort of disposes of that issue. Let me just read into the record the cites to their patents. We're going to use the 1E to the 3 standard. It would be the 597 patent, in particular, at A3950, column 9, lines 33 to 45. The 708 patent, A3920, at column 11, lines 44 to 55. One other thing on the pre-filing investigation, Mr. Mathewitz, at A2880, marked on the test data, in handwritten text, 15 to 17 microns depth. That is the critical depth of etchant that you need to calculate the 1E to the 3. Absence of defects. And so it's clear in that conversation, in those early days, with his handwritten notes, showing the critical factor that's only relevant to the 1E to the 3, that that was considered as well. Again, it shows the pre-filing investigation was complete, and that it was founded on good science, or certainly the science of the day. I have no further things to talk about. I'd be happy to take any questions. I have one further question for you, if I may. I think if I count correctly, this is the third time you two litigants have been up here on appeal in essentially the same set of issues. And I've had the pleasure of sitting now on two of the three. And I was just wondering, when will I get to see you all again? And do you have some new litigation planned for us? Or have you already filed some further litigation between you that I'd like to know about? On the same issue? Yeah, well, on these two patents. There is nothing else that's been filed or planned on these two patents at this time. There was a related case we pointed out in the brief with a different party, Soitech, that has been settled. So hopefully, I believe this case should be, the trial court should be affirmed, the case should be dismissed, and that should be the end. What is the status of the various things we've sent back? They're all laid to rest. They're all laid to rest. This is the last nail sticking up by the board. That's the most promising thing I've heard in a long time. Thank you, Mr. Evans. Thank you, Your Honor. Thank you. Anything for Mr. Evans? Thank you, Mr. Evans. Thank you. Do you agree, Mr. Rader, with Mr. Evans' summary of where we are in all of this? I would like to, Your Honor, but the fact of the matter is MEMC has over 400 patents worldwide based on this technology. In the family of patents relating to the 302 and the 380 alone, there's over 36 U.S. patents. If the court brings an end to this, we're likely to see some litigation in the future, which brings me back. You understand I'm not in any way discouraging or trying to interfere with your right to sue each other. I'm just trying to get an updated status report. Well, we're the ones getting sued, so it's a reason for this kind of antitrust conduct on this family of patents that were based on fraud on the patent office is why we're here. Mr. Rader, let me ask you. Mr. Evans, at some length, traced through the rulings of the district court and this court in the litigation involving the 302 patent and the litigation of the district court involving this patent, and it did seem to me that if you step back and look at that, certainly MEMC has had its share of losses, yet the nature has been such that doesn't he have a fairly good point for the argument that, well, there's not support here for charges of sham litigation and so forth? Well, in the case of the sham litigation, the sham litigation is based on a lack or a knowing bringing of the case with no basis for infringement. The one limitation that became the critical limitation relating to kind of let me just back up. I'm going to answer this question. In the case of the arguments that were made to the patent offices, this is critical. They never argued that it was because of the slow cooling process that they used and the V over G relationship that Mr. Evans just talked about. That's not in the argument position. You can look at it for yourself and see that it's not there. What they said was when you use Takano, you don't get a vacancy-dominant area, which is less than 1,000 defects per cubic centimeter. That's a volumetric dimension, not, as he would like to say in using our own patents, which only measure on the surface and are not measuring that particular kind of defect but are only measuring on the surface, not the volume. They used the defect limitation, the less than 1,000 defects per cubic centimeter, as the distinguishing fact over that. So the case was really the arguments that were made to the patent office really related to the results of the process, not the process itself. And this is important because when it came to proving or trying to prove actual reduction to practice, similarly, they did not bring forth evidence that we, in September of 1997, went ahead and used the slow cooling process. That wasn't their evidence. Their evidence, which was rejected by Judge Armstrong, and it's now the law of the case that there was never an actual reduction to practice, their evidence was simply that the results of an experiment they did revealed a wide L band. That was it. Nothing about the process itself or how much it was. So the prior art rulings by Judge Armstrong relate to something, a different issue. When we're talking about the Walker process fraud issues, which is what we're talking about here today, we're not talking about the prior art that was found by the judge to not anticipate the claims. And the reason the judge found the prior art didn't anticipate, because she was very consistent. She first found that there was no infringement because of the fact that they were unable to prove both an axially symmetric region of vacancy dominant material and they were unable to prove less than 1,000 defects per cubic centimeter. So she said, well, since they can't prove that on infringement, your prior art also doesn't show that. And so what we have here is a situation where we do have prior rulings, but those prior rulings don't dispose of the intent issue under Walker process. There was no evidence as to how this silicon would meet these claim limitations, which were result-based rather than process-based, or how the process was used in the patent, or how the process even disclosed in the patent was used. And so all the evidence that we presented to the court and is in the record, which we refer to, is very illustrative. On the issue of priority, I want to touch on that for just one second. When there was a claim made in the patent office in the 380 patent application, I would refer the court to the arguments made at Appendix 431 through 35. And you will see in that argument section in the 380 that MEMC argued that this prevents both the formation of agglomerated interstitial and vacancy defects. So at the time they were arguing about why they were different from the prior art in the 380, even though they're claiming now they were only directing that application to interstitial. The specification talks about reducing defects of both interstitial and vacancy. The arguments made to the patent office talked about reducing defects on both vacancy and interstitial. And nevertheless, they made a false claim of priority to get around the two references that the examiner said showed that. Thank you. Thank you, Mr. Rader, and thank you, Mr. Evans. Case is taken under advisement. Thank you. Thank you.